**MMA CONSULTANTS 1, INC., Plaintiff,**

v.

**REPUBLIC OF PERU, Defendant.**

**15 Civ. 5551 (DAB)**

United States District Court, S.D. New York.

Signed March 24, 2017

492

Patrick Ahern, Ahern and Associates, P.C., Chicago, IL, for Plaintiff.

Owen C. Pell, White & Case LLP, New York, NY, for Defendant.

## MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge

Plaintiff MMA Consultants 1, Inc. ("MMA" or "Plaintiff") brings this action against the Republic of Peru ("Peru" or "Defendant") alleging breach of contract based on Defendant's alleged failure to remit payment on certain bearer bonds held by Plaintiff. Defendant moves to dismiss the action for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). For the reasons discussed herein, Defendant's Motion to Dismiss is GRANTED.

### I. Background

#### a. The Bonds in this Case

The bonds at issue in this case (the "Bonds") arose from a period in Peru's history when it was involved in the exploitation and sale of guano.[1] In 1865, the Consignee Company for the Guano in the United States of America ("CCG") was formed for the purpose of operating an export network for the sale of guano in the United States. (Guano Case (Chile, France) Arbitral Award ("Award") at 150–51, Soderberg Decl. Ex. A; see also Ahern Decl. Exs. 1–3.[2]) Upon CCG's formation, Peru granted it the exclusive right to export and sell guano in the United States as Peru's consignee. (Award at 150, 336.) CCG was incorporated and headquartered in Peru. (Id. at 150.)

In 1875, Peru passed a law authorizing the free sale of guano in the United States, in contravention of Peru's consignment contract with CCG. (Id. at 155.) In order to terminate CCG's exclusive sales rights, Peru and CCG negotiated and entered into a new contract in Lima, Peru, in 1875. (Id.) Under the 1875 contract, CCG abandoned its exclusive right to sell guano in the United States and waived its right to be reimbursed by Peru on its existing debt to CCG. (Peru & CCG Contract of 1875 ("1875 Contract") Art. 1, Soderberg Decl. Ex. B; see also Award at 155.) In return, Peru recognized a total indebtedness to CCG of four million Soles.[3] (1875 Contract

---

1. "Guano is the manure of seabirds and bats prized as a natural fertilizer for its high phosphate content and for making gunpowder." Adam Clanton, *The Men Who Would Be King: Forgotten Challenges to U.S. Sovereignty*, 26 UCLA Pac. Basin L.J. 1, 38 n.201 (2008).

2. The Court's consideration of the various evidence attached to the Parties' motions is discussed in the section below.

3. Soles were a form of Peruvian currency in use at the time.

Art. 4; Award at 156.) Pursuant to the 1875 Contract, Peru also "undert[ook] to issue and to deliver to the Company,"[4] at a rate of 90%, 3,600 Bonds representing $1,000 each. (Award at 156.)

The 1875 Contract provided that the Bonds "shall be issued, and their servicing shall be filed in New York City." (1875 Contract Art. 5.) CCG's financial agents in New York were to be the agents of Peru "for the purposes of the issue and servicing" of the Bonds. (Id. Art. 6.) These agents would bear the costs of printing, issuing, and servicing the Bonds; as compensation, the agents would receive commission, at Peru's expense, on a percentage of the quantity of Bonds issued, the interest paid on the Bonds, and the value of the Bonds once fully amortized. (Id.) CCG would be responsible for servicing Bonds, which it would accomplish by applying the proceeds from the guano sales that would have otherwise gone to Peru as profit. (Id. Art. 2; see also Award at 169.)

The terms of repayment appear on the face of the Bonds. (Bonds, Compl. Ex. A, Soderberg Decl. Ex. C.) First, the Bonds provide that the government of Peru "acknowledges itself indebted into the Guano Consignment Company ... or Bearer," and "promises to pay ... in the manner here-in-after to be stated." (Id.) Interest was to accrue on the Bonds at a rate of 7% per annum, and could be redeemed semi-annually "from and after the first day of May 1875 on surrender of the annexed coupons as they may severally become due." (Id.) Interest was to cease accruing "from and after the day on which the principal shall become payable." (Id.) Principal was to be paid in the following manner:

On the 1st March 1876 out of the entire number of Certificates issued Three hundred and sixty Certificates shall be drawn by lot being 10% of the total amount issued; on the 1st March 1877 out of the Certificates remaining after the first drawing takes place. Five hundred and forty Certificates shall be drawn by lot, being 15% of the total amount issued on the 1st March 1878 out of the Certificates remaining after the two previous drawings have taken place. Seven hundred and twenty Certificates shall be drawn by lot being 20% of the total amount issued; on the 1st March 1879, out of the Certificates remaining after the three previous drawings have taken place, Nine hundred Certificates shall be drawn by lot being 25% of the total amount issued on the 1st March 1880 there will be One thousand and eighty Certificates remaining not drawn, and these shall be considered and deal (sic) with ... as if they had been drawn by lot on the said 1st March 1880.

(Id.)

After each drawing, the serial numbers of the Bonds drawn were to be "inserted immediately ... in two morning daily papers of the City of New York, for two consecutive days," along with an announcement that the corresponding Bonds would "be redeemed on the 1st day of May then next ensuing." (Bonds.) The Bonds were to be paid "on and after said 1st of May in the respective years ... upon presentation and surrender." (Id.) Payment of both principal and interest was to occur "at the Office of Mess Hobson, Hurtado and Company, Financial Agents of Peru in New York." (Id.)

The Bonds were signed by the "Financial Agents of Peru," as well as the "Envoy Extraordinary and Minister Plenipotentia-

**4.** The Bonds, the 1875 Contract and the Award each refer at times to CCG as "the Company."

ry of Peru in Washington," who affixed a "seal of office and signature on behalf of the Government of Peru in the City of New York, on this first day of May 1875." (Id.)

b. Historical Context and International Arbitration

The guano that was the subject of Peru and CCG's consignment relationship was also the cause of a war between Chile and Peru, beginning in 1879 and culminating in a Peace Treaty dated October 20, 1883. (Award at 126, 128.) By the end of this war, Chile had conquered all of Peru's then-known guano deposits. (Id. at 126.)

Before the war, however, Peru had mortgaged the guano deposits to secure its debts to various creditors, many of whom were foreign nationals. (Award at 126.) In consideration of these claims, the 1883 Peace Treaty required Chile to allocate the proceeds from the conquered guano equally between itself and the Peruvian creditors with debts secured by the guano. (Id. at 127.) To accomplish this, Chile agreed to deposit the creditors' portion of the proceeds in an account in the Bank of England. (Id.) The Treaty then called for the constitution of an arbitration tribunal to resolve the creditors' competing claims to the proceeds, including "the legitimacy or the validity of their debt securities as well as the priority in the reimbursement of their respective claims." (Id.)

CCG's operations ended in 1881, and the final settlement of its accounts concluded in 1893. (Award at 158.) The final accounting showed a remaining debt of $7,026,653.38 owed by Peru to CCG. (Id. at 160.) This sum reflected Peru's total debt minus the face value of the Bonds, which CCG still held in its possession. (Id.)

The Arbitration mandated by the 1883 Treaty was held in 1901. (Award at 79–80, 125.) CCG appeared in the Arbitration, claiming a total debt of $7,026,653. (Id. at 160.) In order to determine the validity of CCG's claim and the mortgage purportedly underlying it, the Arbitration Tribunal examined the long history of Peru–CCG debt, including the series of Bonds at issue in this case. (See generally id. at 149–70, 332–38.) The Tribunal recounted the somewhat unusual trajectory of these Bonds between the time of their issuance and the Arbitration:

> The 3,600 debt certificates ... were actually issued by the Government to the Company. The latter paid its agents the commission of 2 ½% provided for by Art. 6 of the Contract of April 24/May 7, 1875, but kept the certificates for itself. The Company credited the Government first for the total amount, and then debited it successively, at each due date, the amount of the depreciation that should have taken place, and the interest.

(Id. at 158.)

Simply put, despite the instructions set forth in the Bonds, the Arbitrational Tribunal found that, "[f]or one reason or another, the certificates [5] were not issued to the public." (Award at 168.) Instead, CCG kept the Bonds and credited Peru for their total value, at a 90% rate, thereby reducing Peru's debt by the corresponding amount on its books. (Id. at 158, 337.) Then, between 1876 and 1880, CCG debited Peru's account on each due date for the interest and principal that should have been due. (Id. at 158.) CCG also debited Peru for the stipulated issuance commission, which it disbursed to the Office of Mess Hobson, Hurtado and Company ("Hobson Hurtado"), the parties' joint financial agent, and credited to its own account. (Id. at 168, 337.) In this way, by 1880, "the transaction was completed"— not by issuance, payment and redemption,

---

**5.** The Bonds are referred to as the "certificates" in the Award and on their face.

but "by amortization of the still outstanding certificates" in the hands of CCG. (Id. at 168.)

In essence, through successively crediting and debiting Peru's account but never publicly issuing the bonds, CCG and Peru engaged in a "purely fictitious loan transaction" created "by a simple set of documents." (Award at 169.) Specifically, the Tribunal found that: (1) "the certificates were undoubtedly issued by the Government of Peru to the Company"; (2) CCG, "which did not even try to establish that it had sought to put the certificates into circulation, underwrote [the certificates] on its own behalf"; (3) CCG "placed [the certificates] in current account credited to [Peru] . . . when it received them"; (4) CCG "debited Peru in its current account, at each maturity, the amount of interest and depreciation"; and (5) CCG still "own[ed] [the certificates]" at the time of the Arbitration. (Id. at 337.)

Unusual as this transaction may seem, the Tribunal found it "clear[ ]" that Peru and CCG "had contemplated the eventuality [that] the Company would underwrite the certificates on its own account." (Award at 338.) In fact, from the Tribunal's viewpoint, the Bonds were only "delivered to [CCG] . . . in order to allow it to seek its payment by a determined method." (Id.) Due to the peculiar mechanisms of this transaction, however, by the end of 1880, Peru's debt to CCG had only increased. The Bond debt, too, although nominally "amortized," had simply been carried over into a "new account." (Id.) Because of this remaining debt—and because the Tribunal found that CCG main-

tained a valid mortgage on the guano [6]—the Tribunal held that CCG was entitled to partake in the recovery established by the Award.

As part of its decision, the Tribunal was also forced to consider whether CCG was disqualified from participating in the Award due to its Peruvian nationality. Certain other creditors competing for the proceeds claimed that, as a Peruvian company formed by Peruvian citizens and firms and headquartered in Peru, CCG was an "internal" or "domestic" creditor of Peru. (Award at 162.) The Tribunal noted that "[Peru's] obligations of 1866 [7] . . . were issued in New York, with interest payable and capital redeemable in New York; The same holds for the 3,600 certificates from 1875." (Id. at 164.) On the other hand, the Tribunal found it "undeniable that the Consignment Company is a creditor of the Domestic Debt . . . [meaning] the debt resulting from a loan disbursed within the country itself . . . [and] that the Debt represented by the Company has been contracted in Peru." (Id. at 318.) Nonetheless, the Tribunal rejected the internal/external and domestic/foreign distinctions raised by the creditors as unfounded and irrelevant to the Arbitration. (Id.)

The Award ultimately granted CCG entitlement to 2/32 of the Bank of England deposit. (Id. at 386.) This recovery amounted to a minor portion of the outstanding debt that Peru owed to CCG.

### c. Subsequent Laws Involving the Bonds

In 1907, the Ministry of Treasury and Commerce submitted a Report to the Or-

---

**6.** Much of the Award's discussion of the Bonds involved whether the 1875 Contract creating them constituted a novation of earlier contracts between the parties that granted CCG a mortgage on certain guano. The Tribunal rejected the argument that the 1875 Contract constituted a novation, and found that

CCG's mortgage on the guano remained. (See Award at 338.)

**7.** In 1866, Peru and Chile jointly issued $2 million in bonds in New York City, with subscriptions amounting to $1,535,000. (Award at 151.) These bonds are not at issue in this case.

dinary Congress of 1907 regarding Peru's debt to CCG. (Soderberg Decl. Ex. E.). Following a request from CCG for payment in the amount of $7,026,653.38, this Report required Peru to pay CCG a total of 1,477,088 pounds, seven soles forty-six cents, the "final balance of their accounts with the Government." (Id.) The Report further required that:

> 2.—Payment shall be made once the Company delivers the three thousand six hundred certificates ... which it is required to return to the tax authorities.
> 3.—It is understood that the fact the Company is receiving the bonds completely terminates all matters between the government and the Company.

(Id.) Notwithstanding this directive, there is no evidence in the record that any of the Bonds were ever actually returned.

In 1937, Peru passed Law No. 8599, Statute of Limitations on Government Debt. (Soderberg Decl. Ex. F.) This law provided, in relevant part, that claims related to government debt, including "Internal Debt Bonds," would expire within 15 years if the bondholders had not collected interest or performed any act asserting their ownership interest within that time period. (Id.)

### d. The Current Lawsuit

Plaintiff is an Illinois corporation that possesses 14 of the 1875 Bonds. (Compl. ¶¶ 1–2.) Plaintiff does not provide any information as to how or when it obtained the Bonds. Instead, Plaintiff simply alleges that in May, June, and July of 2015, it sent three successive letters demanding payment on the Bonds to the Minister of Economics and Finance of Peru, care of the Embassy of Peru in Washington, D.C., each of which received no response. (Id. ¶¶ 11–14.)

On July 16, 2015, Plaintiff filed the instant lawsuit, alleging breach of contract based on "Plaintiff's repeated demands for payment ... [and] Peru's failure and re-fusal to pay the principal and interest due on the fourteen (14) Bonds." (Id. ¶ 17.) Defendant denies that it owes any obligation to Plaintiff, and contends that the action fails both on the merits and due to a lack of jurisdiction.

### II. Discussion

#### a. Legal Standards on a Motion to Dismiss

##### i. Legal Standards For a Motion to Dismiss Under 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of a claim when the federal court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first." United States v. N.Y.C. Dep't of Hous., Pres. & Dev., No. 09 Civ. 6547(BSJ), 2012 WL 4017338, at *3 (S.D.N.Y. Sept. 10, 2012) (quoting Rhulen Agency, Inc. v. A.L. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990)); see also Stahl York Ave. Co., LLC v. City of New York, No. 14 Civ. 7665(ER), 2015 WL 2445071, at *7 (S.D.N.Y. May 21, 2015).

When resolving issues of subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits and exhibits. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); Zappia Middle East Const. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). A court must generally "accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor." Figueroa v. Ministry for Foreign Affairs of Sweden, 16–cv–00682 (JGK), 222 F.Supp.3d 304, 307, 2016 WL 6952300, at *1 (S.D.N.Y. Nov. 28, 2016). The ultimate

"burden of proving subject matter jurisdiction by a preponderance of the evidence" lies with the plaintiff. Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

### ii. Legal Standards For a Motion to Dismiss Under 12(b)(6)

For a complaint to survive a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (citation and alteration omitted). "In keeping with these principles," the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.

■ In considering a motion under Rule 12(b)(6), a court must accept as true all factual allegations set forth in a complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, which, like a complaint's "labels and conclusions," Twombly, 550 U.S. at 555, 127 S.Ct. 1955, are disregarded. Nor should a court "accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

■ "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010). Additionally, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (citation omitted). A court may also "consider matters of which judicial notice may be taken." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)). However, a document outside the complaint may not

serve as the basis for a dismissal unless it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and it is "clear that there exist no material disputed issues of fact regarding the relevance of the document." Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).

### b. The Evidentiary Issues

Plaintiff has raised a number of evidentiary challenges, which the Court will address before turning to the substance of Defendant's arguments.

### i. The Motion to Strike

On September 7, 2016, Plaintiff filed a Motion to Strike or Exclude the Lide Declaration attached to Defendant's Motion to Dismiss. (ECF No. 23.) Defendant correctly points out that this motion was both (1) untimely and (2) an improper vehicle for challenging a declaration attached to a motion to dismiss. See Fed. R. Civ. P. 12(f) (motions to strike a pleading may be "made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."); Granger v. Gill Abstract Corp., 566 F.Supp.2d 323, 335–36 (S.D.N.Y. 2008) ("[Rule 12(f)] allows a court to strike pleadings only. . . . Motions, declarations and affidavits are not pleadings."); Shamrock Power Sales, LLC v. Scherer, 12 Civ. 8959 (KMK), 2016 WL 7647597, at *7 (S.D.N.Y. Dec. 8, 2016). Plaintiff essentially uses its Motion to Strike as a pretext for supplementing the arguments already raised in its opposition papers. This is an improper use of the motion.

Nevertheless, the Court has an independent obligation to assess whether the submitted materials may be properly considered on a motion to dismiss. Thus, the Court addresses each of the evidentiary objections raised by Plaintiff below.

### ii. The Arbitration Award

Plaintiff objects to the Court's consideration of the Arbitration Tribunal's 1901 decision (the "Award"), which was annexed, in part, to both Parties' Motions and cited extensively in their briefs.[8]

■ On a motion to dismiss under Rule 12(b)(1), where evidence relevant to the jurisdictional question is before the court, the court "may refer to [that] evidence," Makarova, 201 F.3d at 113, and in fact, " 'must' do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 n.6 (2d Cir. 2001). This evidence may include affidavits, exhibits and declarations, all subject to the familiar standards of admissibility found in Fed. R. Civ. P. Rule 56. Hijazi v. Permanent Mission of Saudi Arabia to the United Nations, 689 F.Supp.2d 669, 670 (S.D.N.Y. 2010) ("[In considering materials outside of the pleadings,] the Court is guided by that body of decisional law that has developed under Federal Rule of Civil Procedure 56.").

■ Here, neither Party contests the authenticity of the Award; on the contrary, both attach portions of the Award to their briefs and rely on its findings heavily to make their jurisdictional arguments. Because the Award is relevant to the jurisdictional question, the Court may, and in fact, must consider it with respect to Defendant's 12(b)(1) Motion.

■ In addition, "[w]hen a motion to dismiss is premised on the doctrine of collateral estoppel, a court is permitted to take judicial notice of and consider the complaints and the record generated in

---

8. Plaintiff does not object to the Court's consideration of the 1875 contract, which is referenced in the Bonds that are attached to its Complaint and the subject of this case.

both actions without having to convert the motion to dismiss into a summary judgment motion." Peralta v. St. Lukes Roosevelt Hosp., No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015) (quotation marks and citation omitted). Here, Defendant's collateral estoppel defense arises from the findings in the Award, and the Court would be unable to assess this argument without reviewing the Award. Thus, the Court may also consider the Award for this purpose.

Two other factors support the Court's consideration of the Award. First, Plaintiff did not lack notice of the Award, and the terms and effect of the Award are integral to its Complaint. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991). While Plaintiff does not cite to the Award—or any other source of knowledge—in its Complaint, many of its allegations reflect the factual narrative recited in the Award.[9] Cf. McGown v. City of New York, No. 09 Civ. 8646(CM), 2010 WL 3911458, at *4 (S.D.N.Y. Sept. 9, 2010) ("[P]laintiff cannot evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the [document] to the complaint or to incorporate it by reference." (quoting I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991))). The Award not only provides context to these allegations, but serves as the basis for several of Plaintiff's arguments opposing dismissal. Cf. Anand v. New York State Dep't of Taxation and Fin., No. 10-CV-5142 (SJF), 2012 WL 2357720, at *2 n.2 (E.D.N.Y. June 18, 2012) ("The Court finds that the arbitrator's decision is 'integral' to the complaint because it elucidates the nature of the allegations and disciplinary proceedings against plaintiff.").

Second, the Court may take judicial notice of the Award. Effie Film, LLC v. Pomerance, 909 F.Supp.2d 273, 298–99 (S.D.N.Y. 2012) (courts may take judicial notice of historical facts revealed in undisputed, authoritative writings); Missere v. Gross, 826 F.Supp.2d 542, 553 (S.D.N.Y. 2011) ("The Court may ... take judicial notice of all documents in the public record."). Neither Party here disputes the authenticity of the Award or its contents; they simply disagree as to its proper interpretation. See Hotel Emps. & Restaurant Emps. Union, Local 100 v. City of New York Department of Parks & Recreation, 311 F.3d 534, 540 n.1 (2d Cir. 2002) (taking judicial notice of the facts contained in a historical text detailing the construction of Lincoln Center); Oneida Indian Nation of New York v. State of N.Y., 691 F.2d 1070, 1086 (2d Cir. 1982) ("When there is no dispute as to the authenticity of such [historical evidence] materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible."). Thus, the Award may be judicially noticed and considered with respect to Defendant's Rule 12(b)(6) Motion. See Blue Tree Hotels, 369 F.3d at 217 ("[W]e may ... look to public records, including complaints filed in state court, in deciding a motion to dismiss."); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) ("We may consider [on appeal from a motion to dismiss] ... any matters of which judicial notice may be taken.").

9. Thus, the Court does not believe that there is any material factual dispute as to the "relevance" of the Award that would preclude the Court from considering it on Defendant's Rule 12(b)(6) Motion. See Faulkner, 463 F.3d at 134. While Plaintiff argues that the Court should not consider the Award, Plaintiff, like Defendant, relies on the historical information found in the Award in both its Complaint and opposition papers. Thus, the Award is clearly relevant, and the Court would be unable to address the Parties' arguments adequately without it.

Plaintiff argues that the Court should not consider the Award because its scope was expressly limited to the disbursement of the Bank of England deposit, and did not include other claims against Peru as debtor.[10] This argument is repeated in Plaintiff's collateral estoppel discussion, where it carries slightly more weight. In this context, however, it is unclear why the limited scope of the Tribunal's decision should ipso facto bar the Court from considering it. Because the Award details the history of the Bonds, it is unquestionably relevant. Indeed, Plaintiff has presented the Court with little other evidence to guide its jurisdictional inquiry.

For these reasons, the Court finds that it may consider the Award on Defendant's Motion to Dismiss.

### iii. The Lide Declaration

Defendant attaches to its Motion a declaration submitted by James H. Lide (the "Lide Declaration"), Vice President of Exhibits and Interpretive Planning Services at History Associates, Inc ("HAI"). The Lide Declaration presents the results of archival research performed by Lide, which, as a whole, purport to demonstrate that the Bonds were never publicly issued, announced, or redeemed in New York. This conclusion is not drawn from what turned up in Lide's research, but from what did *not*: any evidence of the Bonds' presence in New York during the relevant time period. In service of this point, the Lide Declaration attaches, inter alia, various newspaper articles, advertisements, and trade publications related to other, similar bonds circulating in the United States at the time—all of which *were* produced by Lide's research.

Plaintiffs object to the Court's consideration of the Lide Declaration—even if only used for jurisdictional purposes—on the grounds that it is inadmissible expert opinion, inadmissible hearsay, and lacking a proper foundation.

### 1. Expert Opinion

Plaintiff claims that the Lide Declaration is inadmissible expert opinion because (1) Lide's methodology is unreliable, (2) he is not an expert in the relevant subject matter, and (3) his testimony does not aid the trier of fact. Defendant counters that the Lide Declaration is not expert testimony, and that the Court may take judicial notice of the Declaration, its exhibits, and its contents. More broadly, Defendant claims that Plaintiff's arguments regarding admissibility under Fed. R. Civ. P. 56 are inapplicable on a motion to dismiss under Rule 12(b)(1).

Defendant's final contention can be quickly dispensed. The Second Circuit has found that the admissibility of evidence presented on a Rule 12(b)(1) motion is guided by the standards set forth in Fed. R. Civ. P. Rule 56. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986) ("Rule 56 is relevant to the jurisdictional challenge in that the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings."). Defendant has presented no case law holding to the contrary.

In addition, the Court is not persuaded that it can take judicial notice of the assertions made in the Lide Declaration—all to the effect that Lide's "extensive research" produced no evidence of the Bonds—particularly when these assertions are disputed. See Martinez v. BAC Home Loans

---

10. The Award, for example, states that "the technicality of [its] ruling should be limited to dividing up th[e] deposit. ... It is not ... within [the Tribunal's] powers to rule on other claims that could be made against the Governments of Peru and Chile." (Award at 91.) Similarly, the Tribunal found that it "does not have jurisdiction to rule on pleadings aimed at anything other than dividing up the deposit in London." (Id. at 100.)

Servicing, L.P., No. 13 Civ. 02867(LGS), 2014 WL 2653275, at *3 (S.D.N.Y. June 13, 2014) ("While Plaintiff is correct that Mr. Kaiser's assertions in his declaration should not be considered on this motion ... the Court is nevertheless entitled to take judicial notice of facts 'not subject to reasonable dispute,' such as the Pennsylvania state court order attached to the declaration."); Loveman v. Lauder, 484 F.Supp.2d 259, 267 n.48 (S.D.N.Y. 2007) ("[T]he Court may take judicial notice of matters of public record. ... It would be entirely inappropriate, however, to take judicial notice of the ... dubious conclusions that plaintiff would draw from those facts.").

■■■■■ Because Defendant does not offer the Lide Declaration as expert testimony and has not attempted to satisfy its burden of establishing admissibility under Fed. R. Evid. 702,[11] the Court will not consider whether the Declaration qualifies as such. See Newport Elecs., Inc. v. Newport Corp., 157 F.Supp.2d 202, 208 (D. Conn. 2001) ("The court declines to weigh the reliability of these declarations under the standards of Rule 702 because these witnesses were not offered as experts."); cf. United States v. Commey, 452 Fed. Appx. 21, 23 (2d Cir. 2011). As lay testimony, however, the assertions in the Declaration are improper. See Fed. R. Evid. 701. Lide, through his position at HAI, was "retained by" Plaintiff's counsel "to research the 1875 Guano Certificates" in this case. Lide Decl. ¶ 1; cf. Wechsler v. Hunt

Health Sys., Inc., 198 F.Supp.2d 508, 529 (S.D.N.Y. 2002). The Declaration summarizes the results of this research, and is neither "based on [Lide's] direct personal knowledge and perception of factual matters at issue," nor "a product of his actual participation and involvement" in the facts of the case. Schenectady Indus. Corp. v. Upstate Textiles, Inc., 689 F.Supp.2d 282, 287 n.3 (N.D.N.Y. 2010).

Moreover, the significance of the Lide Declaration lies in what did *not* turn up in Lide's research: any trace of the 1875 Bonds in the United States. This fact is only relevant if the Court assumes that *had* the Bonds been issued or drawn in New York, Lide's research would have produced evidence showing as much.[12] Thus, the relevance of the Lide Declaration requires the Court to rely on the diligence and quality of Lide's research, and not "a layperson's personal knowledge." Fed. R. Evid. 701, Advisory Committee Note (2000). The conclusion that the nonproduction of evidence is more likely due to the Bonds' absence in the United States than incomplete research is one based, "in whole or in part, on [Lide's] specialized training and experience" and not on the "reasoning process ... of an average person in everyday life." United States v. Garcia, 413 F.3d 201, 216–17 (2d Cir. 2005). Therefore, the assertions in the Lide Declaration are not proper lay testimony. Because they also may not be judicially noticed, they will not be considered by the Court.[13]

---

11. Under Fed. R. Evid. 702, "[t]he proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence." Baker v. Urban Outfitters, Inc., 254 F.Supp.2d 346, 353 (S.D.N.Y. 2003).

12. For example, the Lide Declaration asserts that "HAI conducted extensive research. ... That research located no evidence that the Certificates were ever issued in the United States." (Lide Decl. ¶ 9.)

13. While "these opinions may, nonetheless, have been admissible pursuant to Rule 702 ... before such testimony could have been proffered pursuant to Rule 702, [the proponent] was obligated to satisfy the reliability requirements set forth in that Rule." Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 182 (2d Cir. 2004).

On the other hand, the Court may take judicial notice of the exhibits attached to the Lide Declaration. See Garber v. Legg Mason, Inc., 537 F.Supp.2d 597, 612 n.4 (S.D.N.Y. 2008) (taking judicial notice of newspaper articles for the fact of their publication). Many of these exhibits lose relevance outside of the context of the Lide Declaration: Exhibits B–F,[14] for example, contain the artifacts of other bonds that were produced by Lide's research. Because their relevance depends on (or at least seeks to underscore) the reliability of Lide's research, they must be disregarded.

Exhibits G–J, however, contain reports and articles from the late 1800s detailing Peruvian debt instruments and the guano trade. The theory of relevance here is that had the Bonds been publicly available, they would have been mentioned in these reports; the more comprehensive the report, the more significant the exclusion. While these reports are perhaps minimally probative, their relevance is not defined by reference to Lide's research. Similarly, Exhibit K contains a partnership directory and congressional hearing transcript indicating that Hobson Hurtado was liquidated in 1881. This, too, has relevance independent of the quality of Lide's research. Accordingly, Exhibits G–K are relevant and may be judicially noticed, subject to the hearsay analysis performed below.

### 2. Hearsay

Plaintiff next contends that the exhibits attached to the Lide Declaration are hearsay.[15] Defendant counters that Plaintiff's hearsay argument is irrelevant because the Court may take judicial notice of the exhibits.

Plaintiff is correct that even on a motion under Rule 12(b)(1), the Court may not consider hearsay statements. See Kamen, 791 F.2d at 1011. Of course, the Lide Declaration's principal goal was not to prove the truth of the contents of the exhibits, but "merely to show the results observed by [Lide] when he conducted his ... search." Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC, No. 07 Civ. 5804(GEL), 2009 WL 959775, at *9 n.6 (S.D.N.Y. Apr. 8, 2009); cf. United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013) ("[I]f the significance of an offered statement lies solely in the fact that it was made ... the statement is not hearsay." (quotation marks and citation omitted)). However, because the Court has disregarded the assertions in the Declaration as well as Exhibits B–F, the relevance of the remaining exhibits lies in what is stated (or not stated) in the documents themselves, making them presumptively hearsay.

Nevertheless, these exhibits all contain documents over 20 years old, and so would be admissible under the "ancient documents" exception to the hearsay rule. See Fed. R. Evid. 803(16). Exhibits G and H are excerpts from newspaper articles, and thus are self-authenticating under Fed. R. Evid. 902(6).[16] See TufAmerica, Inc. v. Codigo Music LLC, 162 F.Supp.3d 295, 321 n.33 (S.D.N.Y. 2016) ("[T]he Billboard Article is over twenty-years old and is thus both admissible under the 'ancient document' hearsay exception and self-authenticating."). Exhibits I through K include trade reports and a congressional

---

14. Exhibit A contains a copy of Lide's curriculum vitae.

15. Plaintiff also argues that the Lide Declaration itself is inadmissible because it relies on hearsay. Because the Court finds the assertions in the Lide Declaration inadmissible regardless, it does not consider this argument.

16. The fact that the exhibits were print-outs or digital copies of the original news articles does not change the Court's conclusion. See Fed. R. Evid. 101(b)(6); cf. In re First Hartford Corp., 63 B.R. 479, 483 n.2 (Bankr. S.D.N.Y. 1986).

hearing transcript. The former would likely qualify as self-authenticating under Fed. R. Evid. 902(6) or 902(7), and the latter under Fed. R. Evid. 902(5). See Stern v. City of New York, No. 12-CV-5210 (NGG), 2015 WL 3827653, at *2 (E.D.N.Y. June 19, 2015); In re UBS Auction Rate Sec. Litig., No. 08 Civ. 2967(LMM), 2010 WL 2541166, at *14 (S.D.N.Y. June 20, 2010); Pass & Seymour, Inc. v. Hubbell Inc., 532 F.Supp.2d 418, 438 (N.D.N.Y. 2007); United States v. Hing Shair Chan, 680 F.Supp. 521, 526 (E.D.N.Y. 1988). In any case, the Lide Declaration provides sufficient information to supplement a finding that these exhibits are "what the proponent claims." See Fed. R. Evid. 901(a). Thus, Exhibits G–K are not barred by either the foundational requirements or the rules of hearsay.

The Court notes that, notwithstanding Plaintiff's evidentiary objections, the admission or exclusion of the Lide Declaration ultimately has minimal impact on the outcome of the case. As described in greater detail below, the undisputed facts are enough to resolve the jurisdictional question. Still, "[w]hile much of the material provided ... may prove of little use to the Court," Victoria's Secret Stores, 2009 WL 959775, at *9 n.6, the Court sees no reason to exclude it with respect to Defendant's Motion under Rule 12(b)(1).

### c. The Foreign Sovereign Immunities Act

Having resolved the evidentiary issues, the Court now turns to the question of whether it has jurisdiction over this action. The jurisdictional issue must be determined before the Court turns to the merits of Plaintiff's Complaint. See Integrated Utilities Inc. v. United States, No. 96 Civ. 8983(SAS), 1997 WL 529007, at *2 (S.D.N.Y. Aug. 26, 1997).

The Foreign Sovereign Immunities Act ("FSIA") "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Under the FSIA, a foreign state is presumptively immune from the jurisdiction "of state and federal courts in the United States unless one of a number of statutory exceptions applies." Atlantica Holdings v. Sovereign Wealth Fund Samruk–Kazyna JSC, 813 F.3d 98, 106 (2d Cir. 2016); see also Chettri v. Nepal Rastra Bank, 834 F.3d 50, 55 (2d Cir. 2016) (quotation marks omitted). Before the court turns to these exceptions, "the defendant must first present a prima facie case that it is a foreign sovereign." [17] Arch Trading Corp. v. Republic of Ecuador, 839 F.3d 193, 199 (2d Cir. 2016).

In a motion under Rule 12(b)(1), the Court must review the pleadings as well as the factual submissions submitted by the Parties. Robinson, 269 F.3d at 140. If the defendant presents a factual challenge to the plaintiff's jurisdictional claim, "the plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted"; however, "the ultimate burden of persuasion remains with the alleged foreign sovereign." Id. at 141 (quotation marks and citation omitted). Once the plaintiff has carried its burden of production, the court must resolve any disputed issues of fact in order to determine whether an exception to immunity applies. Id.

The Plaintiff here alleges that the Court has jurisdiction under the "commercial activities exception" found in 28 U.S.C. § 1605(a)(2). This exception provides that

---

**17.** There is no dispute here that Defendant, the Republic of Peru, qualifies as a foreign sovereign under the FSIA.

a foreign state is not immune from jurisdiction in cases where:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Plaintiff specifically claims that the Court has jurisdiction under the first and the third clause of the exception. If either clause is satisfied, the exception applies and Defendant forfeits immunity. Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 154 (2d Cir. 2007).

### i. Factual Findings Regarding Jurisdiction

In determining whether the commercial activities exception applies, the Court must first resolve certain factual disputes between the Parties. Plaintiff principally bases its jurisdictional claim on two facts: (1) that the face of the Bonds indicate that they were signed in New York City, and (2) that the Bonds designate a New York City office as the place of payment. Thus, according to Plaintiff, the Bonds were issued in New York and payable in New York. Defendant, on the other hand, contests jurisdiction by claiming that the Bonds were never actually issued, and so as a practical matter, never actually payable in New York.

Despite the Parties' wildly different ways of framing the facts, their accounts are not irreconcilable. Plaintiff repeatedly refers to the Bond terms, which state that

they were signed "on behalf of the Government of Peru in the City of New York," and which require "both principal and interest to be paid ... at the Office of Mess Hobson, Hurtado and Company, Financial Agents of Peru in New York." (Bonds.) Defendant does not dispute this. For its part, Defendant argues that the Bonds matured without ever having been publicly issued; that the drawings and announcements required by the Bond terms never occurred;[18] that Bonds were simply debited and credited to Peru's account between 1876 and 1880; and that CCG still had them in its possession as of 1901. Plaintiff does not contest these assertions.

This narrative forms the undisputed factual core of the case. The remaining disputes between the Parties boil down to disagreements about how the Arbitration Award should be interpreted and what inferences and conclusions the Court should draw from the facts outlined above.

The Parties' first such dispute involves whether the Bonds were in fact "issued." While both Parties rely on excerpts from the Award to support their arguments, the Award itself is fairly straightforward. The Tribunal found that the Bonds were "undoubtedly issued" by Peru to CCG, which then placed them in a "current account credited" to Peru and held onto them until the Arbitration. (Award at 337.) The Bonds remained in CCG's possession throughout their redemption period, and CCG debited Peru's account for each payment "that should have taken place." (Id. at 158.) The Bonds were therefore "issued" in the sense that they were delivered by Peru to CCG, although never, at least until 1901, circulated beyond that.

---

**18.** In its Opposition, Plaintiff concedes that Peru never publicly issued the Bonds or conducted the drawings and announcements required by the Bonds. (Pl.'s Opp'n at 21; id. at

9 n.9.) This is essentially what the Lide Declaration sought to prove; thus, regardless of its admissibility, this fact would remain undisputed by the Parties.

Similarly, the Parties disagree about (1) whether the Bonds were effectively redeemed and (2) whether the Bonds constituted "internal Peruvian debt." (Def.'s Rep. at 4.) Again, both Parties cite to the Award but arrive at opposite conclusions.

The first question does not have a straightforward answer. Throughout the redemption period, CCG credited and debited Peru's account exactly as if the Bonds had been publicly issued—the sole difference was that the Bonds remained in CCG's possession, rather than ending up, post-redemption, at the office of CCG's financial agent. By the end of this period, Peru's debt on the Bonds had disappeared, but its total debt to CCG had increased. Ultimately, CCG was unable to obtain payment from Peru to cover the debt.

Either way, the question of whether this arrangement constituted an "effective redemption" of the Bonds involves a theoretical inquiry, and not a factual one. Defendant's principal argument is that because the Bonds were never publicly issued, drawn, or announced, a condition to the contract failed, and no payment obligation ever arose in New York. The resolution of this issue does not depend on the way in which the Tribunal characterized Peru's post–Bond debt.

The Parties' second dispute, too, has little bearing on the jurisdictional inquiry. The semantic distinctions regarding internal/external creditors and domestic/foreign debt were rejected by the Tribunal and provide no new insight to this Court. While the Tribunal indeed acknowledged that CCG was a "creditor of [Peru's] Domestic Debt," Award at 318, this simply meant that CCG had contracted its debt in Peru—a fact that is clear, as it relates to

this case, from the face of the Bonds themselves.

A more difficult question is where the execution and delivery of the Bonds took place. On one hand, CCG was a Peruvian company headquartered in Lima, and the 1875 Contract creating the Bond obligation was signed in Peru. (See Bonds; 1875 Contract at 22, Soderberg Decl. Ex. B at 8.) On the other hand, CCG was a company doing business in the United States, with financial agents in New York. The Bonds themselves were signed by both the Minister of Peru "in Washington . . . on behalf the Government of Peru in the City of New York," as well as the "Financial Agents of Peru," which in this case, likely refers to Hobson Hurtado. (See Bonds.) Although Defendant suggests that the Bonds *remained* in Peru from the time of their issuance until the Arbitration,[19] it presents no evidence that execution of the Bonds took place anywhere other than New York City. The weight of the evidence thus indicates that the Bonds were executed in New York City.

In sum, while the Parties fiercely debate the history of the Bonds, the facts most salient to jurisdiction are largely undisputed. These facts show that the Bonds were never publicly issued, and instead, were delivered into CCG's possession, where they remained until at least 1901. Upon issuance, the parties' shared financial agent received its stipulated commission. Then, between 1875 and 1880, the Bonds were used as a tool to refinance the Peru–CCG debt, which only increased as a result. On every scheduled payment date, CCG simulated "servicing" the Bonds by debiting Peru's account in the agreed-upon

---

**19.** Defendant contends that the Bonds were "delivered to [CCG] in Peru," Def.'s Rep. at 4, but the part of the Award to which it cites simply states that the Bonds were delivered to CCG, and is silent as to where this happened.

In fact, there are no conclusive facts in the record regarding where the Bonds were delivered to CCG. The Court thus disregards this conclusory assertion.

amount; this continued throughout the redemption period. For purposes of this motion, the Court also accepts that the Bonds were executed in New York.

With this factual narrative, the Court turns to whether this case falls into one of the clauses of the commercial activities exception to FSIA immunity.

ii. The First Clause of the Commercial Activities Exception

■■■ The first clause of the commercial activities exception applies where "the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). An action is "based upon" the "'particular conduct' that constitutes the 'gravamen' of the suit," OBB Personenverkehr AG v. Sachs, —— U.S. ——, 136 S.Ct. 390, 396, 193 L.Ed.2d 269 (2015), or "those elements . . . that, if proven, would entitle a plaintiff to relief." Id. (citation omitted).

■■■ Jurisdiction under this clause requires "a significant nexus . . . between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action."[20] Reiss v. Societe Centrale Du Groupe Des Assurances Nationales, 235 F.3d 738, 747 (2d Cir. 2000) (alteration in original) (citation and quotation marks omitted). The relevant inquiry is not "whether the foreign state generally engages in commercial activity in the United States, but . . . whether the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States." Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1018 (2d Cir. 1991); see also 28 U.S.C. § 1603(e). Thus, the "mere fact" that conduct occurring in the United States "would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [conduct] for purposes of § 1605(a)(2)." OBB, 136 S.Ct. at 395.

The Parties do not provide theories on the "basis" of this action, and in fact, devote the majority of their arguments to the third clause of the exception. Nonetheless, the Court begins, as it must, by identifying the "particular conduct" underlying Plaintiff's "core claim," Atlantica Holdings, 813 F.3d at 107, and determining where the foundation of the claim is "geographically based." Id. at 108.

■■■ Plaintiff's sole claim is that Defendant breached the terms of the Bonds by failing to remit payment to Plaintiff when requested. Plaintiff alleges that, in 2015, it sent three letters to the Peruvian Minister of Economics and Finance, all of which were ignored.[21] Beyond these sparse allegations, however, Plaintiff fails to set forth a clear theory of breach. Perhaps unsurprisingly, Plaintiff does not claim that any breach occurred before 2015; nor does it offer any connection between the alleged breach in 2015 and any of Peru's conduct in the United States in the late 1800s. Even if the Court were to take a broader view of the "gravamen" of Plaintiff's claim, however, the allegations here do not estab-

---

**20.** The Parties do not dispute that the Bond transaction here constitutes "commercial activity" within the meaning of 28 U.S.C. 1605(a)(2). See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 617, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) ("Argentina's issuance of the [bonds] was a 'commercial activity' under the FSIA.").

**21.** Defendant provides copies of a fax request sent by Plaintiff's attorney to the Minister in 2012, and the Minister's response stating that the Bonds were defunct and would not be paid. (Soderberg Decl. Ex. G.) Plaintiff does not respond to these allegations, and it is unclear whether Plaintiff's attorney was representing Plaintiff or another client at the time. In any case, whether Plaintiff contacted Peru in 2012 or 2015 does not impact the jurisdictional analysis.

lish commercial activity having substantial contact with the United States.

 The Court looks first at Plaintiff's core claim of breach: that Defendant failed to respond to Plaintiff's requests for payment. The failure to respond to a payment demand, and even the failure to pay, are not "acts" under the FSIA. Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 138 (2d Cir. 2012) ("[T]he failure to act is not itself an act in the United States." (internal brackets and citation omitted)).[22] On the other hand, "[t]he decision by a foreign sovereign not to perform [a contractual obligation] is itself an act," but it is one occurring "in the foreign state." Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 76 (2d Cir. 2010) (emphasis added); see also Peterson Energia Inversora, S.A.U. v. Argentine Republic, 15–cv–2739 (LAP), 2016 WL 4735367, at *5 (S.D.N.Y. Sept. 9, 2016) ("[Defendant's] decisions not to make a tender offer or enforce the tender offer requirements occurred in Argentina."). This conduct thus cannot serve as the basis for jurisdiction. Cf. Exch. Nat'l Bank of Chicago v. Empresa Minera Del Centro Del Peru S.A., 595 F.Supp. 502, 504 (S.D.N.Y. 1984).

The Bonds' designation of a New York office as the place of payment is also immaterial under the first clause. Cf. Fir Tree Capital Opportunity Master Fund, LP v. Anglo Irish Bank Corp., No. 11 Civ. 0955(PGG), 2011 WL 6187077, at *15 (S.D.N.Y. Nov. 28, 2011) ("[T]he mere fact that a debt instrument is payable in the United States is not generally sufficient to constitute 'commercial activity' under the FSIA."); Exch. Nat'l, 595 F.Supp. at 504 ("[T]he fact that the ultimate [bond] seller . . . exists under the laws of the United States and the fact that the note was made payable in New York . . . do not satisfy the Act[ ]."). And while the Bonds may have been executed in New York, this only speaks to one element of Plaintiff's claim, and thus cannot form its basis.[23] Similarly, even assuming that Hobson Hurtado's receipt of the issuance commission constitutes sufficient activity, it is activity wholly unrelated to Plaintiff's claim. Cf. Human Rights in China v. Bank of China, No. 02 Civ. 4361(NRB), 2005 WL 1278542, at *3 (S.D.N.Y. May 27, 2005) ("The fact that $20,000 was briefly deposited by Chase into the Bank's U.S. currency account in New York . . . is purely incidental to HRIC's claims against the Bank.").

In short, the Bonds arose from a contract negotiated in Peru between Peru and a Peruvian corporation. Although executed in New York, the Bonds were never publically issued and were held by CCG through their redemption period as part of a refinancing arrangement between the parties. Plaintiff's sole allegation of breach is that when it demanded payment from Peru, over one hundred years later, it received no response. Plaintiff thus cannot

---

**22.** Even if Peru had responded—as Defendant claims they had in 2012—providing notice of an alleged breach does not constitute an act under the FSIA. Rogers, 673 F.3d at 138.

**23.** In Shapiro, the Second Circuit found the first clause satisfied where the defendant had issued bonds to a United States corporation, the bonds "physically traveled to the United States" and were placed in escrow in the United States, and the purpose of their issuance was to raise capital in the United States. See 930 F.2d at 1019. Here, the Bonds were not delivered to a United States corporation, were neither circulated nor held in the United States, and primarily were intended to refinance a private debt with a Peruvian corporation rather than raise capital in the United States. Further, Shapiro pre-dated the Supreme Court's decision in OBB, which held that "based upon" within the FSIA meant "those elements . . . [that] would entitle a plaintiff to relief," 136 S.Ct. at 396, and not simply, as the Shapiro court found, a "nexus." See Shapiro, 930 F.2d at 1018–19.

establish that the gravamen of its Complaint is based upon a commercial activity having a substantial contact with the United States, and the first clause of the commercial activities exception does not apply.

### i. The Third Clause of the Commercial Activities Exception

■ Plaintiff also claims jurisdiction under the third clause of the commercial activities exception. This clause is satisfied where the lawsuit is "(1) 'based . . . upon an act outside the territory of the United States'; (2) 'that was taken in connection with a commercial activity of [the foreign state] outside this country'; and (3) 'that caused a direct effect in the United States.'" Morris v. People's Republic of China, 478 F.Supp.2d 561, 567 (S.D.N.Y. 2007) (quoting Weltover, 504 U.S. at 611, 112 S.Ct. 2160). The analysis of the "basis" of Plaintiff's claim "applies equally to all three prongs of the commercial activities exception." Kensington Int'l, 505 F.3d at 156.

■ An effect is "direct" under the third clause "if it follows as an immediate consequence of the defendant's" activity, meaning that, "between the foreign state's commercial activity and the effect, there was no intervening element." Guirlando, 602 F.3d at 74 (quotation marks omitted). This requirement is "satisfied where the parties to a transaction, including the sovereign defendant, specifically agree or specifically contemplate that payment will be made to a United States bank account, and the plaintiff's cause of action arises out of that transaction." Skanga Energy & Marine Ltd. v. Arevenca S.A., 875 F.Supp.2d 264, 271 (S.D.N.Y. 2012).

■ To sustain jurisdiction under the third clause, this Circuit also applies a "legally significant acts test," which simply "requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply." Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 240 (2d Cir. 2002) (quotation marks and citation omitted). The legally significant acts are those "giving rise to [plaintiff's] claim," Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2d Cir. 1991), aff'd by 504 U.S. 607, 112 S.Ct. 2160; Plaintiff must then show "a causal connection between those acts and the alleged injury it sustained." Virtual Countries, 300 F.3d at 241. In breach of contract actions, courts generally characterize the "legally significant acts" as the conduct giving rise to the underlying breach.[24] See Hanil Bank v. PT. Bank Negara Indonesia (Persero), 148 F.3d 127, 133 (2d Cir. 1998) ("[T]he most legally significant act—the breach of contract—occurred in the United States."); Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993) ("The 'legally significant' act was . . . the breach that occurred in the United States.").

---

**24.** In breach of contract cases, the application of the legally significant acts test has caused some confusion, as it often results in a conflation of the act-the decision not to perform—and its effect—the nonperformance of the contract. See Guirlando, 602 F.3d at 76. The Second Circuit has noted that in most cases, the outcome is the same, because both tests are satisfied if the claim is for nonpayment on an obligation due in the United States. See id. ("[W]ith respect to . . . a nonpayment . . . the effect is the same because the reference is to a 'payment [that] was to take place . . . but did not.'"). However, this conflation led a number of earlier courts to find that the act *itself* must be performed in the United States, a result at odds with the express language of the third clause. See id. at 76 ("[T]he third clause . . . denies a foreign state immunity for a claim based . . . upon *an act outside* the territory of the United States." (internal quotation marks omitted)). What is significant in this case is simply that the third clause requires that (1) a legally significant act occurred, and (2) this act had a direct effect in the United States. See id. at 77.

In sum, the third clause requires that: (1) plaintiff's claim is based upon an act outside the United States taken in connection with defendant's commercial activity elsewhere;[25] (2) the act is legally significant; and (3) the act caused a direct effect in the United States. Under this analysis, the Court must engage with the merits of Plaintiff's claim to the extent necessary to determine which acts are legally significant to the claim, and whether these acts caused Defendant to forego an obligation it was required to perform in the United States. Cf. Robinson, 269 F.3d at 143 ("Courts are ... regularly called upon to inquire into substantive state or federal law to resolve the threshold question of subject matter jurisdiction under the FSIA.").

There is one additional wrinkle to the Court's analysis under the third clause: in this Circuit, some courts have recognized that "[n]othing in the commercial activity exception expressly limits cognizable effects to those felt solely by plaintiff." Morris, 478 F.Supp.2d at 569 (comparing the analysis in Comm. Bank of Kuwait v. Rafidain Bank, 15 F.3d 238 (2d Cir. 1994)). Thus, a plaintiff could at least "arguably rely on the effect felt by the former holders of his bonds" to allege a direct effect. Morris, 478 F.Supp.2d at 569.

Adopting this framework raises a number of questions. For example, if jurisdiction is based on an earlier-felt effect, would the legally significant conduct need to be causally connected to this effect, or the injury underlying the plaintiff's claim? And, if the former, how could this conduct form the basis of the plaintiff's claim? Here, the gravamen of Plaintiff's claim is that Defendant breached the contract in the Bonds by failing to remit payment to Plaintiff in 2015, not that it defaulted before this; the circumstances regarding the handling of the Bonds in the late 1800s only bear on, at most, a single element of Plaintiff's claim.[26] The Court thus finds it questionable that any construction of the third clause would permit it to base jurisdiction on effects unrelated to the breach alleged by Plaintiff. Nonetheless, out of an abundance of caution, the Court will examine whether Plaintiff can state a claim for jurisdiction based on either current or prior effects.

For its part, Plaintiff makes no attempt to either identify legally significant conduct or connect it to an alleged effect, leaving the Court to its own devices to connect the dots. Plaintiff simply points out that the Bonds designated a New York office as the place of payment, and argues that under Weltover, this is sufficient. See 504 U.S. 607, 112 S.Ct. 2160. In Weltover, the plaintiffs brought a breach of contract claim against Argentina for unilaterally extending the maturity dates on bonds payable in New York. Id. The Supreme Court sustained jurisdiction under the third clause of the FSIA because the "rescheduling ... was taken in connection with ... [a] commercial activity and had a 'direct effect' in the United States." Id. at 620, 112 S.Ct. 2160. It was "uncontested" in Weltover that the plaintiff's claim was "based upon an act outside" the United

---

**25.** The Parties do not dispute that any allegedly significant act was taken "in connection with" Defendant's commercial activity outside the United States.

**26.** This distinction is potentially significant. In Morris, the case recognizing that an effect may be felt by prior bondholders, the plaintiff was suing for defendant's default on the scheduled interest payments and principal—both breaches that occurred decades prior to the lawsuit. The legally significant conduct, as characterized by the court, was defendant's "failure to make designated payments." 478 F.Supp.2d at 571 n.14. Thus, the conduct that could have produced prior effects was also the conduct forming the basis of plaintiff's claim.

States, "presumably Argentina's unilateral extension." Id. at 611–12, 112 S.Ct. 2160 (internal quotation marks omitted). Thus, in Weltover, there was a clear connection between the defendant's default, the effect in the United States, and the plaintiff's claim: Argentina's unilateral extension was the basis of plaintiff's suit and the conduct that prevented payments due to a New York bank from arriving as required—the "direct effect" felt in the United States.

Here, Plaintiff does not claim that Defendant defaulted by failing to pay for the Bonds as they became due. Nor does Plaintiff dispute that the payment dates on the Bonds were little more than dates on which CCG would debit Peru's account. In fact, Plaintiff does not claim that any breach occurred during the period when the Bonds were payable in the New York office. Instead, Plaintiff contends that when the drawings and announcements failed to take place, Defendant's obligation to repay the Bonds at Hobson Hurtado never accrued; [27] thus, according to Plaintiff, no breach *could* have occurred until it presented the Bonds to Defendant for payment in 2015. By this account, the Bond terms requiring payment at the New York office were not breached, but waived.

Even assuming, then, that Plaintiff could base jurisdiction on the fact that payments never arrived at Hobson Hurtado in the late 1880s, Plaintiff does not allege any legally significant conduct directly connected to this effect. See Atlantica Holdings, 813 F.3d at 108–09 (Direct effect is found "so long as the United States is the place of performance for the breached duty." (emphasis added)); Skanga, 875 F.Supp.2d at 271 ("The direct effect requirement is satisfied where the parties . . . specifically contemplate that payment will be made to a United States bank account, and the plaintiff's cause of action arises out of that transaction." (emphasis added)); cf. Virtual Countries, 300 F.3d at 241 ("[M]ere financial loss without a legally significant act does not establish jurisdiction." (quotation marks and citation omitted)). The opportunity to default at Hobson Hurtado never arose because the Bonds were never issued to the public; if the failure to circulate the Bonds could be conceived of as a breach,[28] it is neither one committed by Defendant nor with any legal relevance to Plaintiff's claim.[29]

Plaintiff provides no other allegations that might permit the Court to base jurisdiction on a pre–2015 effect. Cf. Morris, 478 F.Supp.2d at 569 ("[P]laintiff has not put forward any evidence regarding the provenance of the eight bonds he now holds, nor does he allege that antecedent owners were U.S. citizens who suffered direct effects in the United States."). By all accounts, the 1875 Contract specifically contemplated the Bonds' function as a refinancing tool for privately held debt between two foreign parties; even the New York office, Hobson Hurtado, was an agent to both of the parties in the transaction. Thus, Plaintiff can identify no legally

---

27. Plaintiff raises this theory in its statute of limitations argument. As discussed in the sections that follow, the merits of Plaintiff's claim strongly depend on its contention that no breach occurred prior to 2015.

28. The Court finds this unlikely, given that the Bond terms provide that payment would be made to *either* CCG or the bearer, and impose no express obligation on CCG (much less Peru) to circulate them after receipt.

29. Similarly, the fact that Hobson Hurtado may have received a commission on the transaction is no more relevant with respect to the third clause than the first, where it bears no relation to Defendant's current liability on the Bonds. Cf. Antares, 999 F.2d at 36 ("That the money came from a bank account in New York is a fact but one without legal significance to the alleged tort.").

relevant conduct that caused a direct effect in the United States during a prior period of Bond possession.

 The Court now turns to Plaintiff's sole allegation of breach, and what it assumes is the basis of Plaintiff's lawsuit: Defendant's failure to respond to Plaintiff's request for payment in 2015. Even assuming that a breach occurred in 2015, Plaintiff cannot demonstrate a direct effect in the United States.

As an initial matter, this Court questions whether Plaintiff could have suffered *any* cognizable effect, where it "likely purchased the long-defaulted bonds for a few hundred dollars in a 'collectibles' market," and not as legitimate financial instruments. Morris, 478 F.Supp.2d at 567.[30] More significantly, even a demonstrated loss to Plaintiff would not, alone, constitute a direct effect. Guirlando, 602 F.3d at 78 ("[P]hysical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States."); accord Chettri, 834 F.3d at 57.

On the other hand, a direct effect could be found if the Bonds either "contractually obligated [Defendant] to pay in this country," Rogers, 673 F.3d at 139, or "suggest[ed] a reasonable understanding that" performance could be required in this country. Id. at 140. Although not raised by Plaintiff, this argument presents a closer call, as New York was certainly the original place of performance. The latter standard—bond language "suggest[ing] a reasonable understanding" of performance in this country—was recently proposed as a possible basis for jurisdiction by the Second Circuit in Rogers. See 673 F.3d at 140. Even under this standard, however, the court found no direct effect where the

bonds neither required performance in the United States nor authorized the bondholder to designate a place of performance. See id. at 139–40.

Here, as in Rogers, the Bonds do not permit the bondholder to designate a place of performance. Instead, the Bonds merely promise payment "in the manner here-inafter to be stated," and go on to describe the yearly drawings, announcements, and redemptions that never occurred. The terms also provide that the percentage of Bonds still outstanding in 1880 were to be treated as if drawn in 1880, at which point they, too, could be presented at Hobson Hurtado for payment. Thus, after 1880, it does not appear that the Bonds obligated Defendant to do *anything*, in the United States or elsewhere. Cf. Kensington Int'l, 505 F.3d at 159 ("The New York judgment placed no obligations or responsibilities on SNPC or Itoua to perform *any* act, let alone one in the United States."); Virtual Countries, 300 F.3d at 240 ("No obligation—contractual or otherwise—ran to the plaintiff from the Republic, let alone one to be performed in the United States.").

In any case, under the Bond terms, principal and interest were "to be paid" not in New York generally, but "at the office of Mess Hobson, Hurtado and Company," a company that has not existed for over 130 years. Cf. Weltover, 941 F.2d at 148 ("Payment was to be made on either the New York, London, Frankfurt, or Zurich markets, at the election of the creditor." (emphasis added)). Given that the Hobson Hurtado office has long since closed, it would not be reasonable to assume that it remains a place of performance. Cf. Mor-

---

**30.** Like the Court in Morris, this Court notes the evidence submitted by Defendant showing that at least some of the 1875 Bonds have been posted for sale on eBay. Soderberg Decl. Ex. I; see 478 F.Supp.2d 568 n.10. Although

not required to do so at this stage, see Shapiro, 930 F.2d at 1019, Plaintiff has made no attempt to show how it came into possession of the Bonds or to refute the claim that they were bought as collectibles.

ris, 478 F.Supp.2d at 571 n.14 ("The banks are not all gone and the contractually designated places of payment are all outside the United States."). And because Plaintiff's breach claim involves conduct postdating Hobson Hurtado's closing by more than a century, the alleged breach has not "resulted in the failure of funds destined for New York to arrive there." Hanil, 148 F.3d at 132.

Plaintiff itself claims that once the maturity dates passed, "[t]he only way in which a bond could be repaid was to be presented to Peru for payment." (Pl.'s Opp'n at 21.) Under Plaintiff's theory, the non-circulation of the Bonds caused the requirement of payment at Hobson Hurtado to lapse, while the requirement of repayment, more generally, remained. Presumably, Defendant could have satisfied this obligation anywhere. Cf. Virtual Countries, 300 F.3d at 240 ("[Where] defendants could have discharged their obligations by tendering payment elsewhere ... courts have declined jurisdiction under the FSIA." (quotation marks omitted)); see also Kensington Int'l, 505 F.3d at 159 ("This judgment does not have a 'place of performance.' ... Payment could come from anywhere and take any form.").

In essence, Plaintiff's claim does not arise from Defendant's failure to pay at Hobson Hurtado, and Plaintiff could not reasonably assume that any obligation to pay there remained. Nor was "the ultimate objective of the contract—the contract's raison d'etre—... the payment of funds in the United States." Rogers, 673 F.3d at 139 (quoting Filetech S.A. v. France Telecom, S.A., 212 F.Supp.2d 183, 197 (S.D.N.Y. 2001)). The Bonds themselves stipulate that Peru was to "issue and deliver [them] to [the] Company ... in part payment of certain indebtedness of the Government of Peru to the said Company." (Bonds.) The purpose of the Bonds was thus the refinancing of debt between a foreign sovereign and a foreign national, not the payment of money in the United States.

More than 140 years after the Bonds' execution, 135 years after their maturity, and 134 years after the liquidation of Hobson Hurtado, a United States corporation has acquired the Bonds, demanded payment, and filed suit. The Court does not believe that this is sufficient to establish a direct effect in this country. See Rogers, 673 F.3d at 140 ("Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." (quoting Virtual Countries, 300 F.3d at 236)); Filetech, 212 F.Supp.2d at 198 ("To extend jurisdiction to claims brought by all persons indirectly injured by commercial acts of foreign states would subject them to the jurisdiction of United States courts in an enormously expanded number of cases (including, no doubt, many that would eventually be dismissed for failure to state a cause of action)." (quotation marks and citation omitted)).

Accordingly, Plaintiff cannot allege jurisdiction under the third clause of the commercial activities exception, and the Court finds that it has no jurisdiction over this case or the Defendant.

ii. Jurisdictional Discovery

█ In the event that jurisdiction is found lacking, Plaintiff has requested jurisdictional discovery and an evidentiary hearing. The Court does not believe that it is entitled to either.

█ First, jurisdictional discovery is only permitted in the FSIA context " 'to verify allegations of specific facts crucial to an immunity determination,' not to uncover those facts in the first instance." SI Grp. Consort Ltd. v. Ukraine, Ivano–Frankivsk State Admin., No. 15 CV 3047-LTS,

2017 WL 398400, at *4 (S.D.N.Y. Jan. 30, 2017) (quoting First City, Texas–Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998)). Here, Plaintiff has not demonstrated "that it seeks to 'substantiate' specific claims that would demonstrate an exception to Defendants' sovereign immunity." SI Grp., 2017 WL 398400, at *4. In fact, Plaintiff has identified no specific facts that it seeks to verify through discovery. In any case, such an exercise would largely be futile, because the Court has adopted all of the factual claims related to jurisdiction in Plaintiff's Complaint.

Second, Plaintiff "has not shown that a hearing [i]s necessary because the resolution of factual issues [i]s 'not readily ascertainable from the declarations of witnesses' or turn[s] on questions of credibility." Filetech S.A. v. France Telecom S.A., 304 F.3d 180, 183 (2d Cir. 2002) (citation omitted). The Court has not made any factual determinations that depend on a witness's credibility, and it is unclear how a hearing would lend support to Plaintiff's jurisdictional case.

 "Because 'sovereign immunity protects a sovereign from the expense, intrusiveness, and hassle of litigation, a court must be circumspect in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA.'" Arch Trading, 839 F.3d at 206 (citation omitted). Here, Plaintiff has not pointed to any "specific facts that it desires to controvert" or "disputed facts" that are "peculiarly within the knowledge of the sovereign." Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela, 556 F.Supp.2d 272, 282 (S.D.N.Y. 2008) (quotation marks omitted); see also EM Ltd. v. Republic of Argentina,

473 F.3d 463, 486 (2d Cir. 2007) ("[D]iscovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." (quotation marks and citation omitted)). Indeed, the facts crucial to the Court's immunity determination are not disputed at all. The Court thus declines to impose any further burden on the Defendant and rejects Plaintiff's request for jurisdictional discovery and a hearing. See Compania del Bajo, 556 F.Supp.2d at 283.

#### d. Defendant's 12(b)(6) Motion

While the Court has found that it lacks jurisdiction under the FSIA, assuming arguendo that it had jurisdiction, the Complaint would still require dismissal under Rule 12(b)(6). The Court addresses each of Defendant's arguments concerning the merits of the Complaint below.

#### i. The Statute of Limitations

Defendant argues that Plaintiff's Complaint is time-barred by New York's six-year statute of limitations governing breach of contract claims. Plaintiff, in response, contends that the statute of limitations only began to run in 2015, when, according to Plaintiff, it first made a demand for payment.[31] As an alternative, Plaintiff argues that the 20–year limitations period under New York Civil Practice Laws and Rules ("CPLR") § 211 applies, and that the Court should equitably toll the limitations period until 2004, when the Supreme Court came out with their decision Republic of Austria v. Altmann. See 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Both Parties agree that New York law applies to the Court's determination on this issue.

---

**31.** As noted above, it is disputed that Plaintiff first made a demand in 2015. For purposes of Defendant's 12(b)(6) Motion, however, the Court accepts the fact alleged in the Complaint as true. Moreover, whether Defendant first made a demand in 2015 or 2012 does not impact the Court's conclusion with respect this issue.

Under New York law, the limitations period for an "action upon a contractual obligation" is six years. CPLR § 213. This period "begins to run 'on each interest installment from the date it becomes due' and on recovery of the principal from the day after the bond matures." Morris, 478 F.Supp.2d at 571 (internal brackets omitted)(quoting Vigilant Ins. Co. v. Hous. Auth., 87 N.Y.2d 36, 45, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995)); see also White Hawthorne, LLC v. Republic of Argentina, 16–cv–1042 (TPG), 2016 WL 7441699, at *10 (S.D.N.Y. Dec. 22, 2016). Thus, Plaintiff's claim for nonpayment accrued when principal and interest became due under the terms of the Bonds.

Plaintiff attempts to defend against the obvious consequences of this rule by claiming that, because the Bonds were never publicly issued, drawn, or announced, they could not have been presented for payment during their redemption period, and thus never became "due." According to Plaintiff, when these conditions for payment failed to occur, the maturity dates attached to the Bonds lapsed, but the payment obligation remained intact.

The problem with this theory is that if public issuance, drawings, and announcements were truly conditions to repayment, the fact that they never occurred would mean that no payment obligation ever arose, including in 2015. See Office of Comptroller Gen. of Republic of Bolivia ex rel. Gen. Command of Bolivian Air Force v. Int'l Promotions and Ventures, Ltd., 618 F.Supp. 202, 207 (S.D.N.Y. 1985). On the other hand, if they were not conditions, then Defendant's payment obligation would have been unaffected by their non-occurrence, and the Bonds would have matured and expired according to their terms. Of course, practically speaking, the only bondholder during the redemption period was CCG, who chose to retain the Bonds rather than publicly issue them;

thus, no other bondholder could have asserted a right to payment within the redemption period. But this simply underscores the fact that no benefit in the Bonds remains to inure to Plaintiff.

Plaintiff also argues that the statute of limitations on bearer bonds only begins to run when payment is demanded and rejected. (Pl.'s Opp'n at 20.) This is simply not the case. Where a demand is required, a cause of action accrues when payment could be demanded, not when it is demanded. See CPLR § 206(a) ("[W]here a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete."); White Hawthorne, 2016 WL 7441699, at *10 ("[S]tatute of limitations accrues from the time creditor had a right to make demand on the note because parties could not have intended to permit the holder of the note to postpone its maturity as long as it chose to do so." (quotation marks and citation omitted)); Morris, 478 F.Supp.2d at 572 ("A cause of action accrues for the purpose of setting the statute in motion as soon as the creditor, by his own act, and in spite of the debtor, can make the demand payable." (quoting Mundaca Inv. Corp. v. Rivizzigno, 247 A.D.2d 904, 906, 668 N.Y.S.2d 854 (4th Dep't 1998)); Town of Brookhaven v. MIC Prop. & Cas. Ins. Corp., 245 A.D.2d 365, 365, 668 N.Y.S.2d 37 (2d Dep't 1997) ("[Plaintiff] may not extend the Statute of Limitations by simply failing to make a demand.").

In support of its position, Plaintiff cites to a footnote in Rogers v. Petroleo Brasileiro, S.A., in which the district court stated that:

Defendant incorrectly argues ... that the limitation period began to run from the maturity dates of the bonds ... rather than the date the action accrued

according to the facts pleaded in the Complaints. The Complaints clearly allege that Defendant's breach occurred on June 25, 2009, when Petrobrás refused Plaintiffs' conversion requests. 741 F.Supp.2d 492, 509 n.12, rev'd by 673 F.3d 131. Defendant's argument in Rogers was "incorrect" because the plaintiff was not suing for nonpayment, but failure to convert the bonds. See id. at 498. Unlike the repayment provisions, which contained express maturity dates, the conversion option was not explicitly linked to a redemption period; thus, according to the district court, the bonds' maturity dates were irrelevant to the plaintiff's cause of action. See id. at 509 n.12. Nonetheless, in reversing the district court's decision, the Second Circuit noted that a more comprehensive reading of the bond terms indicated that the conversion option was also limited to the redemption period, so that by the time the plaintiffs made their conversion request, "the Bonds no longer had a residual benefit." Rogers, 673 F.3d at 137. In any case, here, Plaintiff is suing for nonpayment on Bonds with an express redemption period. Once this period expired, Plaintiff's claim for nonpayment accrued.[32]

As an alternative, Plaintiff argues that the 20–year statute of limitations under CPLR § 211 applies to its cause of action. Section 211(a) applies to actions to

recover principal or interest upon a written instrument evidencing an indebtedness of the state of New York or of any person, association or public or private corporation, originally sold by the issuer after publication of an advertisement for bids for the issue in a newspaper of general circulation and secured only by a pledge of the faith and credit of the issuer . . . .

CPLR § 211(a).

Plaintiff cannot satisfy these statutory requirements. "First, [D]efendant is not the state of New York, a natural person, or an association or corporation." Morris, 478 F.Supp.2d at 571 n.15; see also White Hawthorne, 2016 WL 7441699, at *6–7 (holding that section 211 does not apply to foreign sovereign debtors). Second, although "the National Faith of Peru" was indeed pledged "towards the faithful performance" of the Bonds, the Bonds were also secured by "the net proceeds of all Peruvian Guano sold for consumption in the United States." Bonds; see Morris, 478 F.Supp.2d at 571 n.15 ("[W]hile the Chinese government 'pledge[d]' its good faith' . . . the entire loan was also secured 'upon the entire revenues of the Salt Administration of China' and 'certain Central Government taxes of the [specified] Provinces.'"); Vigilant, 87 N.Y.2d at 42, 637 N.Y.S.2d 342, 660 N.E.2d 1121 ("Since the bonds are not secured 'only' by a pledge of full faith and credit of the 'issuer,' the long relaxation allowed under CPLR 211(a) is unavailing."). Finally, Plaintiff does not contend that the Bonds were "sold by the

---

**32.** The other cases to which Plaintiff cites are inapposite. Chen Jie Shan v. Citibank, N.A. did not involve bonds, but etchings on a steel box and plates allegedly representing a deposit made in a bank. No. 06 Civ. 5095(PAC), 2007 WL 2325854, at *1 (S.D.N.Y. Aug. 10, 2007). Shan also interpreted the accrual period under CPLR § 206(a)(2), which only applies in cases involving a "deposit of money to be repaid only upon a special demand, or a delivery of personal property not to be returned specifically or in kind at a fixed time or upon a fixed contingency." CPLR § 206(a)(2). Likewise, the discussion in Kupfer v. Fed. Republic of Germany involved whether a pro se complaint that described the bonds as having "guarantors" should be disqualified from the limitations period in CPLR § 211, and whether bearer bonds may be anticipatorily repudiated so as to trigger an earlier accrual of the cause of action. No. 07 Civ. 8589(PAC), 2010 WL 9479058, at *2–3 (S.D.N.Y. Mar. 29, 2010). Kupfer nowhere stated or implied that the limitations period on bearer bonds does not accrue until a demand for payment is made.

issuer after publication of an advertisement for bids for the issue in a newspaper." CPLR § 211(a); see also White Hawthorne, 2016 WL 7441699, at *8–9. Plaintiff provides no explanation for these deficiencies, and thus, the 20–year period in CPLR § 211(a) does not apply.

Although the relevance of Plaintiff's equitable tolling argument ultimately depends on an application of the 20–year period in CPLR § 211, Plaintiff has also failed to demonstrate entitlement to equitable tolling. Plaintiff claims that the statute of limitations should be equitably tolled because it "was not able to bring its action against Peru until 2004," when "the Supreme Court held-for the first time-that the FSIA applies to conduct that occurred prior to its enactment." (Pl.'s Opp'n at 23.) Contrary to these assertions, "foreign governments could be subject to suit since the issuance of the Tate letter in 1952," Morris, 478 F.Supp.2d at 573, which found "foreign sovereign immunity inapplicable in respect to a foreign state's commercial activity." Altmann, 541 U.S. at 709, 124 S.Ct. 2240 (emphasis omitted). The Tate Letter was presumed to apply to both pre- and post–1952 conduct. Id. at 696 n.16, 124 S.Ct. 2240.

Further, the Second Circuit has been clear that "nothing in [the FSIA's] language or legislative history indicates that [a] wholesale reactivation of ancient claims was intended." Schmidt v. Polish People's Republic, 742 F.2d 67, 71 (2d Cir. 1984). Instead, the revival of old claims predating the FSIA's passage is a consequence "wholly uncontemplated by Congress." Id.; see also Morris, 478 F.Supp.2d at 573 ("[T]here is no indication that the Supreme Court meant to suggest much less hold in Altmann that the passage of the FSIA restarted the statute of limitations on otherwise stale claims."). Thus, nothing prevented Plaintiff from filing suit before 2004, and there is no reason to toll the statute of limitations.

Accordingly, the Court finds that Plaintiff's cause of action is time-barred, and the Complaint must be dismissed.

ii. Whether Plaintiff Can State a Claim

Defendant additionally claims that the Complaint must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6). This argument is intertwined with its statute of limitations argument, and may be resolved on a similar basis. In response, Plaintiff merely points out that a bond is a contract, and a bearer bond is payable to the bearer on demand. (Pl.'s Opp'n at 19.)

Plaintiff misses the point of this argument. A bond is, of course, a contract, and the obligations and rights of the parties are thus defined by the terms of the bond. See Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 n.4 (2d Cir. 2009) ("In New York, a bond is a contract and we therefore look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." (quotation marks and citation omitted)). Plaintiff is incorrect, however, that a bearer bond is payable on demand, ad infinitum; like any contract, the provisions of the bond determine the term and structure of its obligations.

Thus, whether framed as a challenge to the timeliness of the action or to the existence of a contractual obligation itself, the result here is the same. The Bonds only promised payment to the bearer in the "manner here-in-after to be stated," according to the "following terms and manners": Interest was to be paid semiannually "on surrender of the annexed coupons as they may severally become due," accruing from May 1, 1875, until "after the day on which the principal shall become payable." (Bonds.) Principal was to be paid

in full on the Bonds drawn each year from 1876 until 1880; in 1880, there would be "One thousand and eighty Certificates remaining not drawn," and these would "be considered and deal[t] with, in regard to what follows, as if they had been drawn by lot on the said 1st March 1880." (Id.) Thus, interest ceased to accrue when the principal became payable, and the principal of all Bonds was to be paid, at the latest, by 1880.

The Second Circuit in Rogers recently discussed its "grave concerns regarding the merits of the complaint" in a similar action. 673 F.3d at 137. In Rogers, the conversion provision at issue contained no express redemption period, but only granted the option to "the holder of this obligation." Id. at 133. Elsewhere, the bonds acknowledged the amount of the issuer's indebtedness and required payment on the bonds "up to their redemption." Id. Reading these two provisions together, the court found that "an 'obligation' existed only through ... the exact date corresponding to a Bond's specified redemption period," not only with respect to repayment, but with respect to the conversion option as well. Id. at 137. Accordingly, "[a]fter the expiration of the redemption period ... the Bonds no longer had a residual benefit ... and a decision not to convert [could not] be a breach." Id.

Like the bonds in Rogers, the Bonds here have an express redemption period. Unlike Rogers, however, Plaintiff is suing for the nonpayment of obligations expressly linked to this period. The plain terms of the Bonds only compelled Defendant to pay interest and principal until 1880, and only required Defendant to pay CCG or the bearer. When the redemption period expired with the Bonds in CCG's hands, so too did Defendant's obligation.

Indeed, even assuming that public issuance, drawings, and announcements were not conditions to Defendant's obligation to pay a non–CCG bearer, this obligation would not have extended much past 1880. See Uniroyal, Inc. v. Heller, 65 F.R.D. 83, 93 (S.D.N.Y. 1974) ("[If parties] intend that the debt shall be [not contingent, but] absolute, and fix upon the future event as a convenient time for payment ... and, if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time." (quotation marks and citation omitted)). Because the redemption period lapsed over 130 years ago, the Bonds no longer retain any residual benefit or obligation. Rogers, 673 F.3d at 137. And because Plaintiff does not allege how the Bonds otherwise entitle it to payment, it cannot state a claim for breach of contract. Cf. Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., No. 14-CV-9962(DAB), 2015 WL 5841232, at *9 (S.D.N.Y. Oct. 1, 2015).

### iii. Collateral Estoppel

Defendant argues that collateral estoppel should attach to the Arbitration Award's findings regarding the issuance and redemption of the Bonds. Specifically, Defendant claims that the Tribunal found that the Bonds were never publicly issued and were effectively redeemed, and that these findings were litigated and necessary to support the Award. Plaintiff contends that collateral estoppel does not apply because the Award's scope was confined to the proceedings before it.

In general, collateral estoppel applies when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks and citation omitted). The Parties here have not briefed many of

the issues that the Court would need to consider before determining the Award's preclusive effect.[33] Nonetheless, a number of factors weigh against applying collateral estoppel to the Award's findings in the instant litigation.

■■■ First, the Court is not convinced that there is an identity of issues between the two proceedings. The Award's discussion of the Bonds was geared toward determining whether CCG maintained a mortgage on the guano, a prerequisite to its successful assertion of a claim. The relevance of the Bond history here involves (1), for jurisdictional purposes, the contacts between Peru and the United States vis-à-vis the Bond transaction, and (2) whether Peru owed any breachable obligation to Plaintiff. Defendant has not carried its burden of demonstrating that these issues are "identical," or that the Tribunal's findings on these issues were necessary to support its judgment. See Kulak v. City of New York, 88 F.3d 63, 72 (2d Cir. 1996) ("The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion."); cf. Levy v. Kosher Overseers Ass'n of Am., Inc., 104 F.3d 38, 41 (2d Cir. 1997).

Further, it is far from apparent that MMA and CCG are in privity, or even have aligning interests. See Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 33 (2d Cir. 2017) ("A party can be estopped from relitigating an issue that was decided adversely to him in a prior litigation only if the issue was litigated by that party, or by a party with substantially similar legal interests."). In the Arbitration, CCG argued that the

Bonds were never "issued," Award at 337; here, MMA seeks to establish that the Bonds were not only issued, but issued in New York. The Court is also mindful of the fact that the Tribunal expressly excluded the adjudication of claims against Peru as debtor from the scope of its decision, even if this fact is not dispositive. Cf. Irish Lesbian and Gay Org. v. Giuliani, 143 F.3d 638, 645 (2d Cir. 1998); Stolberg v. Members of Bd. of Trs. for State Colls. of State of Conn., 541 F.2d 890, 893 (2d Cir. 1976); Lepore v. New York News Inc., No. 72 Civ. 2024 (JMC), 1977 WL 1361, at *1 (S.D.N.Y. Feb. 8, 1977).

Accordingly, the Court finds a number of reasons not to apply collateral estoppel, and few reasons to do so. As a practical matter, of course, the Award has guided the Court's jurisdictional determination, and the facts most central to Plaintiff's contract claim are not, in fact, in dispute. Thus, the Award has evidentiary value irrespective of its preclusive effect, and the resolution of this issue is largely immaterial to the outcome of this case. Nonetheless, the Court finds that collateral estoppel should not attach to the Award's determinations in this proceeding.

### iv. Act of State Doctrine

Defendant's final argument is that the act of state doctrine bars the Court from determining the validity of Peru's 1937 law setting a statute of limitations on government debt.

■■■ The act of state doctrine "confer[s] presumptive validity on certain acts of foreign sovereigns by rendering non-justiciable claims that challenge such acts." Allied Bank Int'l v. Banco Credito Agricola

---

**33.** For example, the Parties have not briefed, adequately or at all, which law should apply to resolve the collateral estoppel issue; whether successor bondholders who have not pleaded how they came into possession of the bonds may claim any type of privity with bondholders from over 100 years ago; and what effect the Tribunal Award's statement that it had no power to rule on claims against Peru has on the availability of collateral estoppel in the instant proceeding.

de Cartago, 757 F.2d 516, 520 (2d Cir. 1985). Its applicability depends, in part, on whether judicial examination of the sovereign's act "would embarrass or hinder the executive in the realm of foreign relations." Id. at 521.

As discussed above, Plaintiff's claim fails on the merits notwithstanding the effects of the 1937 law, and so the Court need not discuss this defense exhaustively. Nevertheless, the Court finds that an application of the act of state doctrine would not be appropriate in this case.

As an initial matter, although a commercial exception to the doctrine has never been established conclusively in this Circuit, courts nonetheless have found that the doctrine "does not ... apply to the purely commercial conduct of a foreign sovereign." Peterson Energia, 2016 WL 4735367, at *7; see also Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 695, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ("[T]he concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities."); cf. Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 809 F.3d 737, 744 (2d Cir. 2016) ("Even if the act of state doctrine is subject to a commercial exception, the exception would not apply.").

In addition, the act of state doctrine requires courts to identify the "situs" of the debt; while formulations of this test may vary, in no case may the Defendant here establish that the situs is Peru. First, the Plaintiff and bondholder, MMA, is located in the United States. See Lightwater Corp. v. Republic of Argentina, No. 02 Civ. 3804(TPG), 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003) ("[B]ond obligations have their situs where the bond holders are located."); cf. Bandes v. Harlow & Jones, Inc., 852 F.2d 661, 666 (2d Cir. 1988) (act of state doctrine "does not

extend to property located within the United States."). Further, while the Court has found that the Bonds are no longer payable at all—and no longer payable in New York, more specifically—there has never been an indication that the Bonds are *only* payable in Peru. See Braka v. Bancomer, S.N.C., 762 F.2d 222, 224 (2d Cir. 1985) (situs of debt was Mexico where debtor "never agreed to pay [certificates] in any location other than Mexico."); Garcia v. Chase Manhattan Bank, N.A., 735 F.2d 645 (2d Cir. 1984) (act of state doctrine did not apply where parties agreed that certificate was repayable at any Chase bank around the world, and not solely Cuba). In short, the Court is not "satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state.'" Daventree Ltd. v. Republic of Azerbaijan, 349 F.Supp.2d 736, 755 (S.D.N.Y. 2004) (quoting Jungquist v. Nahyan, 940 F.Supp. 312, 318–19 (D.D.C. 1996)). For this reason, the Court would decline to apply the act of state doctrine even if it remained relevant to Defendant's defense of the Complaint on the merits.

### III. Conclusion

For the reasons stated above, Defendant's Motion to Dismiss is GRANTED in its entirety. The Complaint of Plaintiff is hereby DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to close the docket in this case.

SO ORDERED.